IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

J. CLARK BUNDREN, M.D.,

           Plaintiff,

         vs.                        Case No. 05-1040-JTM

JOEL PARRIOTT, M.D.,

           Defendant.

MEMORANDUM AND ORDER

This is an action for defamation and tortious interference brought by one physician against another. The action ultimately arises from a state medical malpractice claim in which the plaintiff, Dr. J. Clark Bundren, testified as an expert witness against the defendant, Dr. Joel Parriott. Both parties have now filed motions for summary judgment. For the reasons identified herein, the court will grant the motion for summary judgment of the defendant Parriott.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The following findings of fact exclude any claims of fact, advanced either independently or submitted with the purpose of controverting an opponent's facts, where those claimed facts are not backed by admissible evidence. Thus, purported facts which are not in compliance with D.Kan.R. 56.1(d) are excluded. Rule 56.1(d) provides:

> **Presentation of Factual Material.** All facts on which a motion or opposition is based shall be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answers to interrogatories and responses to requests for admissions. Affidavits or declarations shall be made on personal knowledge and by a person competent to testify to the facts stated which shall be admissible in evidence. Where facts referred to in an affidavit or declaration are contained in another document, such as a deposition, interrogatory answer, or admission, a copy of the relevant excerpt from the document shall be attached.

**Findings of Fact**

Bundren is a full-time faculty member at the University of Oklahoma College of Medicine at its Tulsa campus. His teaching specialty is obstetrics and gynecology, and he has a special interest in the treatment of infertility. Bundren has also been involved in litigation consulting. He has been an American College of Obstetricians and Gynecologists ("ACOG") Fellow for twenty-five to thirty years, and continued his membership to the time of his deposition in the present litigation  He believes that ACOG is a

2

single-minded group with very limited political objectives to subvert parts of the judicial system.  He also believes the ACOG grievance committee is a "kangaroo court." (Bundren dep. at 138).  Still, he testified at his deposition, he believed he must continue his membership in that organization due to professional reputation.

Dr. Parriott is an obstetrician and gynecologist whose practice is located in Salina, Kansas. He has been involved for some time in the peer review process at Salina Regional Health Center ("SRHC".)  In 2002, he was chief of SRHC's medical staff. He has been involved in peer review activities related to the medical staff for six or seven years.  Parriott has been a Fellow of ACOG for 12 years. Although a member, Dr. Parriott has not attended an ACOG regional or committee meeting, and attended a single national meeting while a resident, which may have been an ACOG meeting. He receives the organization's "green journal" and periodically visits its website.

Parriott has not met any of the officers of ACOG, nor has he been a part of the organization's tort reform activities. He has not contributed to ACOG beyond annual dues and he has made no contributions to PACs or tort-reform committees. Parriott Depo. 8:3-21 (Def. Exh. B).

In 2001 in Ottawa County, Kansas District Court, Pamela and John Brandt filed suit against Elizabeth Bonilla and Joel Parriott, M.D. The case involved a birth injury to the Brandts' minor child that occurred during home delivery under the supervision of only defendant nurse Bonilla.  Bundren gave deposition testimony in that case on December 3, 2002.  He testified that Parriott departed from the standard of care applicable to an obstetrician under the circumstances. The defendant nurse settled the claim against her.  Late in the proceedings (on September 16, 2003), Parriott settled the claim against him for $10,000, denominated as "exclusively and expressly for the reimbursement of expenses incurred by attorneys for the plaintiffs. . ." (Plf. Exh. M).

On or about February 8, 2004, Parriott forwarded a complaint against Bundren to ACOG. The complaint contained four opinions concerning Bundren's testimony in the Bonilla lawsuit, and cited medical records, pleadings, correspondence, and testimony of parties and Bundren as foundation for his opinions. At the same time, Parriott completed a pre-printed form required by the ACOG grievance committee, in

3

which he responded "Yes," to the question "Does this complaint involve a factual misrepresentation and/or perjury on fact-based issues as part of an expert witness' testimony? Yes or No (Circle One)." (Def. Exh. E).

The plaintiff Bundren contends in the present lawsuit that Parriott acted maliciously in accusing him of the crime of perjury in the complaint, and that Parriott acted with the purpose of stopping Bundren from serving as an expert witness in the future, thereby depriving him of the income stream he had built over many years.  Plaintiff also alleges:

> . . . the defendant filed his grievance for illegitimate purposes to interfere with Dr. Bundren's ongoing business relationships with various attorneys wherein he reviewed charts to determine whether or not a suit should be filed, and if so, to testify as an expert in the litigation.  Plaintiff also contends that the defendant knew of and wished to interfere with plaintiff's future business of testifying in medical malpractice cases.

Pretrial Order, at 3.  Bundren seeks money damages in this lawsuit.

Bundren concedes that the only two places where the word "perjury" appears in connection with this lawsuit are in his complaint, and in the pre-printed ACOG form which Dr. Parriott was required to submit with his complaint concerning Bundren.

Dr. Parriott has testified he has not accused Bundren of  "perjury."  Rather, he has accused him of factual misrepresentations and those are listed in his own personally-drafted complaint to ACOG.  That complaint contains issues of medical fact.

The ACOG Bylaws provide the requirements for membership in the organization, that is, the qualifications and rules for election of Fellows, as well as the privileges of becoming a Fellow.  ACOG has written procedures for handling complaints against Fellows and proposed termination of Fellowship.  Those procedures apply to complaints filed by one Fellow against another Fellow only, which alleges a violation of the Colleges' Code of Professional Ethics or other behavior inconsistent with the Bylaws' requirements for Fellowship.

ACOG determines whether it should or should not hear the complaint..

ACOG accepted the complaint made by Dr. Parriott as appropriate to be reviewed in its forum, and notified Bundren of the pendency of the complaint.

Complaints before ACOG's grievance committee are confidential, to be discussed only with the complainant, the eight members of the committee and the respondent. A respondent to a complaint may request a hearing, be represented by counsel, call witnesses, and may appeal a decision to the Executive Board of ACOG.  Certain disciplinary actions may be taken against a respondent as a result of a complaint including a warning, censure, suspension and expulsion. Only suspension and expulsion from ACOG are reportable to the National Practitioner Data Bank when they are based on reasons relating to professional competence or professional conduct which affects or could adversely affect the health or welfare of a patient.  ACOG has a Code of Professional Ethics. The code applies to Fellows' ethical responsibilities to patients, other physicians, and to society in general.

According to ACOG procedures, if a complaint later becomes the subject of litigation, the complaint "shall be dismissed."  (Def. Exh. H).  The filing of this lawsuit caused Parriott's complaint to be dismissed.  Bundren knew that Parriot's ACOG complaint would be dimissed when he filed this lawsuit. He considered contesting the ACOG complaint, but chose not to do so, because he believes it is not a fair and unbiased process.

ACOG also has published an "Expert Witness Affirmation." That affirmation provides that as a member of ACOG, a testifying witness agrees to uphold enumerated professional principles in providing expert evidence or expert witness testimony.  Bundren signed such an Expert Witness Affirmation in conjunction with giving his testimony in the malpractice case.

Parriott decided to avail himself of the grievance procedure when he found out about it either through an ACOG mailing, the "green journal," or ACOG's website. He filed the ACOG complaint because he believed that Bundren violated ACOG's guidelines by misrepresenting medical facts in his testimony in the malpractice case.  The complaint contains detailed opinions concerning Bundren's violations of the principles of the Expert Witness Affirmation.

Parriott's ACOG complaint was sent to the ACOG grievance committee.  Bundren has no evidence that Parriott sent his ACOG complaint to anyone but ACOG's grievance committee.

5

Bundren testified that he first learned of the ACOG complaint against him in January, 2005. He then ceased accepting litigation consulting work, and has testified that after the ACOG complaint, he has not received an invitation to participate in an ACOG round-table luncheon discussion. He believes the lack of invitations to participate in round-tables is due to the Parriott complaint, but concedes the lack of invitations may be a coincidence unrelated to the complaint. He suspects that by the time of trial, some companies may stop contacting him for research services, but he has no present evidence that the complaint will cause him to lose research contracts. Since learning of the Parriott complaint, Bundren has turned away (or not responded to) inquiries concerning litigation consulting. He has turned away this business because he has been unwilling to disclose the pending ACOG complaint. At the time he learned of Parriott's complaint, Bundren had no pending consulting work which he discontinued as a result.

Bundren has instructed his staff person to indicate to callers seeking consulting services that he is no longer doing that. He believes that Parriott's purpose in filing his complaint with ACOG was to cut off Bundren's income from providing expert witness services. His evidence of Parriott's alleged ill motive amounts to the fact that Parriott elected to use the ACOG grievance procedure, ignored Bundren's alleged immunity as a witness, and the manner in which Parriott drafted his complaint. He contends that Parriott should have exhausted other avenues for redress of his grievance. Bundren suggested that Parriott should have asked the trial judge for a ruling of some kind on the nature of the testimony which Bundren gave, should have considered a complaint to the Oklahoma licensing authority, or should have considered a discussion with Bundren's dean at the medical school.

Allegation Number 1 of Parriott's ACOG complaint provides:

> Dr. Bundren gave testimony based on an incomplete review of the facts available to him. This is in violation of Principle Number 2 of the Expert Witness Affirmation, "I will conduct a thorough, fair, and impartial review of the facts and the medical care provided, not excluding any relevant information." The central premise of Dr. Bundren's testimony alleging malpractice is that the plaintiffs came to Dr. Parriott for a consultation regarding the candidacy of their planned home delivery rather than for the sole purpose of an ultrasound and its interpretation. He based this premise on a statement given by plaintiff to the sheriff investigating the alleged misconduct of the midwife (Bundren p. 31, line 11 to 25; p. 32, p. 33, p. 34, p. 35, and p. 36, line 1 to line 5). The depositions of the plaintiffs had been taken well before Dr. Bundren opined in his letter that there had been deviation from the standard of care. Yet, he chose to selectively review the testimony of plaintiffs after forming his opinion alleging malpractice (Bundren p. 46, line 4 to line 25, p. 47 line

1 to line 21, and Exhibit Number 5). In fact, on the very day of his deposition, he reviewed limited segments of the plaintiffs' depositions, as identified to him by plaintiff's counsel, that supported his preformed conclusions (Bundren p. 35, line 17, to line 25, p. 36, line 1 to 9). He is unaware by his incomplete review that the totality of the plaintiffs' testimonies directly contradicted this inaccurate perception (Exhibit Number 3 p. 9, p. 10, p. 11, Plaintiff, p. 52, line 15 to line 18, p. 57, line 1 to line 23, p. 61, line 1 to line 15). He implied that complete, prior review of their testimony was unnecessary as it would not "change my opinion about anything." (Bundren p. 47, line 4 to line 10).

Further, he ignored the testimony from Dr. Parriott's deposition, including his dictated note, that directly contradicted his wrongful conclusion (Parriott, p. 79, line 23 to line 25, p. 80, line 1 to line 8, Exhibit Number 10.) In essence, Dr. Bundren formed a conclusion based on a statement made by plaintiff, then selectively chose scanty information to support this faulty premise and ignored or was unaware of an avalanche of information that contradicted his position.

(Bundren Dep. Exh. 10, Def. Exh. N).

In Bundren's testimony in *Brandt v. Bonilla*, Bundren admitted he had not read the complete deposition testimony of Mr. and Mrs. Brandt, the plaintiffs, and had not reviewed their testimony (which was then available) prior to providing his expert opinion in that case, except for reviewing a few select passages of their testimony with the Brandts' counsel just prior to his deposition. He further testified that he did not believe reading the Brandts' deposition testimony would affect his expert opinion already given in *Brandt v. Bonilla*, which relied on a statement given by the sheriff, which included the sheriff's version of certain comments made by the Brandts.

Principle Number 2 of the ACOG Expert Witness Affirmation provides, "I will conduct a thorough, fair, and impartial review of the facts and the medical care provided, not excluding any relevant information." (Def. Exh. K).

Allegation Number 2 of Parriott's ACOG complaint provides:

Dr. Bundren gave testimony outside his area of clinical experience. This is in violation of Principle Number 3 of the Expert Witness Affirmation, "I will provide evidence or testify only in matters in which I have relevant clinical experience and knowledge in the areas of medicine which are the subject of the proceeding." As mentioned, Dr. Bundren had wrongly concluded that the plaintiff came to Dr. Parriott for consultation regarding her planned home delivery. Based on this erroneous premise, he alleged deviation from the standard of care in Dr. Parriott's interaction with the plaintiff. Specifically, he faulted the failure of Dr. Parriott to warn plaintiff of her increased risk for injury to herself or her child if she were to undertake a home delivery. He opined regarding the appropriateness of Dr. Parriott's care yet admitted that he had never had relevant clinical experience regarding consultation about risk factors as they relate to a patient's candidacy for home birth (Bundren p. 23, p. 24, p. 25, line 1 to 23, p. 143, line 24 to 25, and p. 144, line 1 to 4). He further admitted that he is unaware of any standards or protocols as they relate to the

evaluation of a patient which is considering home delivery (Bundren p. 28, line 9 to line 11).

(Exhibit N)).

Bundren opined in *Brandt v. Bonilla* regarding the inappropriateness of Parriott's care of Mrs. Brandt. He conceded in his deposition in that case that he had never had relevant clinical experience regarding consultation about risk factors as they relate to a patient's candidacy for home birth. He further admitted that he is unaware of any standards or protocols as they relate to the evaluation of a patient who is considering home delivery.

Principle Number 3 of the ACOG Expert Witness Affirmation provides, "I will provide evidence or testify only in matters in which I have relevant clinical experience and knowledge in the areas of medicine which are the subject of the proceeding." (Def. Exh. K.)

Allegation number 3 of Parriott's ACOG complaint provides:

Dr. Bundren gave testimony regarding medical fact that was inaccurate and misleading. This behavior is deemed unethical as expressed in ACOG's committee opinion on Ethical Issues Related to Expert Testimony by Obstetricians and Gynecologists. This opinion states, "The College considers unethical any expert testimony that is misleading because the witness does not have appropriate knowledge of the standard of care for the particular condition at the relevant time." The identified errors are as listed:

1. Dr. Bundren asserted that the 50 gram glucola screening test must be given with special consideration to the patient's pretest diet. He stated, "you really have to prepare the patient with a certain diet for two or three days if you're going to do this right. Anymore, the way we do these, at least, they drink their glucose in the morning and you've got to fit the challenge around the food intake correctly." (Bundren p. 93, line 18 to 25, p. 94, line 1 to line 16) This is factually incorrect. (See ACOG Practice Bulletin, Number 30, 2001).

This misstatement is important because he used this as a tenet for his wrongly formed conclusion regarding the plaintiff's motivation for her return visit to Dr. Parriott's office. (Bundren p. 94, line 11 to line 16, p. 130 line 11 to line 25, p. 131, line 1 to line 10). Specifically, he rejected Dr. Parriott's statement that the plaintiff returned for a second visit only because her midwife could not perform this labwork (Parriott, p. 124, line 15 to line 20, p. 140, line 3 to line 6, Plaintiff, p. 98, line 11 to line 16, p. 99, line 4 to line 15) Dr. Bundren contended that the patient likely returned for a second visit as part of planned follow-up and used this medical misstatement about glucola screening as supportive of that contention.

2. Dr. Bundren asserted that a discrepancy in a patient's fundal height as it relates to gestational age was an independent risk factor for the patient despite that discrepancy being explained by the patient's sonogram. (Bundren p. 106, line 4 to 7, p. 108, line 8 to line 12) This is factually incorrect. The plaintiff was noted to have a fundal height measurement of 31/32 centimeters as recorded by standard McDonald Measurements at

8

her visit with Dr. Parriott. Her calculated gestational age by certain LMP was 26 weeks. This gestational age was consistent with the gestational age calculated by the biometric measurements of the ultrasound. Fluid was noted to be adequate and the baby's position was noted to be breech (Exhibit Number 1). The discrepancy in fundal height measurement as it related to the gestational age was explained by Dr. Parriott as being secondary to the baby's breech position and the patient's multiparous status. (Parriott, p. 47, line 12 to line 25, p. 48, line 1 to line 25, p. 49, line 1 to line 25). Dr. Bundren contended that this conclusion was faulty and that further imaging would be required to evaluate this medical non-issue. He asserted that, "you would probably scan the patient another time, perhaps three or four weeks later to confirm interval growth, fetal position and make sure there's an appropriate development. That's a question that probably has to be answered with more than one ultrasound." (Bundren p. 116, line 10 to line 16) Dr. Bundren extrapolated further that the fundal height discrepancy may have been secondary to polyhydramnios. (Bundren p. 118, line 1 to line 9, line 19 to line 25, p. 119, line 1 to line 5, p. 120 line 16 to line 25, p. 121, line 1 to line 11) He made this assertion despite a formal sonogram confirming adequate (normal) fluid (Exhibit Number 1).

3. Dr. Bundren contended that the plaintiff's failure to gain weight over a ten-week time frame put her at high risk (Bundren p. 121, line 12 to line 18). This is factually incorrect. His incomplete review of the records made him unaware that the patient's weight gain for the entire pregnancy had been within acceptable limits at approximately 20 pounds (Exhibit Number 2). He expounded on his wrongful contention by asserting that this failure to gain weight placed the patient at significantly increased risk for intrauterine growth restriction (Bundren p. 121, line 20 to line 25, p. 122, line 1 to line 7). He stated, "usually when patients fail to gain weight, you see intrauterine growth restriction." (Bundren p. 122, line 4 to line 6) This is incorrect. Poor weight gain over an arbitrary time frame is very unlikely to be associated with IUGR as the fundal height at the second visit was stated to be normal (Parriott, p. 71, line 17 to line 25, p. 72, line 1 to line 5) When it was pointed out that the baby's weight at birth conclusively ruled out IUGR, Dr. Bundren does not concede the logic, rather brings up the concern of "subtle glucose intolerance" and possible polyhydramnios (Bundren p. 122, line 17 to line 20). This concern is again raised despite a known normal one hour glucola and a sonogram showing normal fluid (Exhibit 1).

Dr. Bundren pushed this inaccurate logic still further when he stated that the standard of care required that non-stress tests be offered to the patient (Bundren p. 123, line 18 to line 25, p. 124, line 1 to line 24, p. 126, line 5 to line 21). This is incorrect. Although clinicians may differ on their threshold for consideration of antenatal testing, to assert that NSTs were required when there was no clinical indication to do so and that this opinion represents the standard of care is untruthful.

4. Dr. Bundren conceded that the patient's age of 40 in the absence of other comorbidities placed her at a high risk (Bundren p. 129, line 21 to line 25, p. 140, line 1 to line 9). This is factually incorrect. It is recognized that increased maternal age does directly correlate with an increased risk for the patient and fetus in the presence of specific comorbidities. Hypertension, gestational diabetes, chromosomal abnormalities, and some placental issues, particularly placenta previa, are all seen in higher frequency with increasing maternal age. The patient had none of these comorbidities. Studies have shown that age as an independent variable, in a multiparous woman, offers little if any increased risk when compared to younger women. Certainly, it is not a high risk factor.

(Def. Exh. N).

With regard to the glucola screen given Mrs. Brandt by Parriott on her second office visit, Bundren testified in *Brandt v. Bonilla* that, "you really have to prepare the patient with a certain diet for two or three days if you're going to do this right. Any more the way we do these, at least they drink their glucose in the morning and you've got to fit the challenge around the food intake correctly." (Bundren *Bonilla* dep. at 93-94). Bundren also rejected as false Parriott's statement that Mrs. Brandt returned for a second visit because her midwife could not perform glucose testing and lab work. Rather, Bundren testified that Mrs. Brandt likely returned for a second visit as part of a planned follow-up.

Bundren stated that a discrepancy in a patient's fundal height as it relates to gestational age was an independent risk factor for the patient, despite that discrepancy being explained by the patient's sonogram. Bundren also testified that Mrs. Brandt's failure to gain weight between her two visits with Parriott placed the patient at significantly increased risk for intrauterine growth restriction. He stated, "usually when patients fail to gain weight, you see intrauterine growth restriction." (Bundren *Bonilla* dep. at 121-22). When it was pointed out that the baby's weight at birth conclusively ruled out IUGR, Bundren would not concede the logic, and brought up the possibility of "subtle glucose intolerance" and possible polyhydramnios. (Id. at 122-23). Bundren also testified that the patient's age of 40 in the absence of other co-morbidities placed her at a high risk.

**Conclusions of Law**

Defendant Parriott seeks summary judgment on Bundren's defamation claim on the grounds that the ACOG claim contained no false or defamatory words. Under Kansas law, defamation is the communication to a third party of false and defamatory words which result in harm to the plaintiff's reputation. *Hall v Kansas Farm Bureau*, 50 P.3d 495, 504, 274 Kan. 263 (2002).

The complaint alleges — and Bundren reiterates the claim in his response to the defendant's summary judgment motion — that Parriott accused him of perjury in the ACOG complaint. This is not correct. There is no evidence that Parriott ever accused Bundren of perjury. In the completing of the printed questionnaire form used for submitting his complaint, Parriott responded to one question which

10

asked whether the complaint involved "a factual misrepresentation and / *or* perjury." (Def. Exh. E) (emphasis added). Parriott responded affirmatively, and attached a lengthy narrative setting forth his allegations against Bundren, a narrative devoid of any allegations that the alleged errors in Bundren's testimony were intentional or deliberative. No rational finder of fact reviewing Parriott's complete ACOG complaint would conclude that Parriott had accused Bundren of perjury.

What the narrative does contain are the opinions of Parriott, buttressed by an extended recitation of the underlying facts. Under Kansas law, an opinion is not actionable where it discloses the facts upon which the opinion is based, regardless of whether the opinion is defamatory. *Phillips v. Moore*, 164 F. Supp. 2d 1245 (D. Kan. 2001); *El-Ghouri v. Grimes*, 23 F. Supp. 2d 1259, 1269 (D. Kan. 1998).

Moreover, the allegations in the ACOG complaint are substantially true. Those allegations relating to Bundren's failure to review the testimony of the Brandts, his primary reliance on a comment supposedly heard by the sheriff, his lack of experience with or knowledge of standards regarding home birth are all based upon specific statements in Bundren's own testimony. Truth and substantial truth are a complete defense to a claim of defamation. *Wilkinson v. Shoney's, Inc.*, 4 P.3d 1149, 1169, 269 Kan. 194 (2000). Parriott's complaint to ACOG recites a variety of facts, none of which has been shown to be false. The remainder of the complaint constitutes Parriott's opinions that the underlying facts represent departures from ACOG standards. The plaintiff has failed to show that the defendant made any statements of fact which were substantially untrue.

The court finds alternatively that the defamation claim is subject to summary judgment because there is no evidence that the ACOG complaint was communicated with the intent of harming Bundren's reputation. Parriott utilized a confidential grievance procedure. There is no evidence that Parriott otherwise communicated any allegation against Bundren to any third party. Only if the complaint were found to be valid by ACOG peer review could Bundren's reputation eventually suffer. Bundren has no evidence of improper motive on the part of Parriott, other than his sense that it is inappropriate to use the ACOG grievance procedure to address complaints about expert witness testimony; he believes Parriott should have complained to the trial court, Bundren's employer, or the Oklahoma Board of Healing Arts. But the rules

1of ACOG — an organization to which Bundren has voluntarily belonged for many years — explicitly provide such a forum for complaints.

Finally, the court finds that the defamation claim is further defective based on the absence of evidence of harm to Bundren's reputation. There is no evidence the plaintiff's reputation has been harmed as a result of the ACOG complaint. While Bundren complains that he has not recently received invitations to ACOG round-table discussions, he also acknowledges that that might merely be coincidence. Bundren further speculates that — at some point in the future — companies may stop calling for research services, but that hasn't happened yet. The evidence shows that Bundren himself voluntarily stopped taking consulting referrals. He has told his staff person to tell callers seeking consulting services that he is no longer performing that service. In short, Bundren's evidence regarding the injury to his reputation is wholly speculative.

In addition to his claims of defamation, Bundren makes claims of both tortious interference with contract, and tortious interference with prospective business advantage. The court finds that summary judgment is also appropriate as to these claims.

First, Kansas law requires proof that the wrongdoer accused of such conduct knew of the existence of the contract or the prospective advantage. *Burcham, et. al. v. Unison Bancorp*, 276 Kan. 393, 77 P.3d 130, 151 (2003); *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986). Here, there is no evidence that Parriott knew of Bundren's consulting business itself, or of Bundren's relationships with lawyers and his anticipated earnings from those relationships.

Second, Kansas law also requires proof that the wrongerdoer sought intentionally or maliciously to harm the existing contractual or prospective advantages. *Turner*, 240 Kan. at 12.
Again, there is no evidence in the record that Parriott had such a motive. Rather, the evidence shows that rather than communicating his allegations against Bundren openly and publicly, he limited himself to advancing a confidential complaint to a peer group in which both parties were members, which might have remained confidential but for Bundren's commencing the present litigation.

Finally, the court finds the defendant is not liable for damages in this action pursuant to the Health Care Quality Improvement Act.  Parriott is not liable in damages for submitting his ACOG complaint, because the organization's grievance procedure is a "professional review action" within the meaning of the Act.

The Health Care Quality Improvement Act, 42 U.S.C. § 11101, et. seq. provides:

> If a professional review action (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title, except as provided in subsection (b) of this section – ...
>
> > (B)   any person acting as a member or staff to the body, ... [and/or]
> >
> > (D)   any person who participates with or assists the body with respect to the action,
>
> shall not be liable in damages under any law of the United States or of any State ...  with respect to the action.

42 USC § 11102 (a)(1).

A "professional review action" means

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action. In this chapter, an action is not considered to be based on the competence or professional conduct of a physician if the action is primarily based on —
>
> > (A) the physician's association, or lack of association, with a professional society or association,
> >
> > (B) the physician's fees or the physician's advertising or engaging in other competitive acts intended to solicit or retain business,
> >
> > (C) the physician's participation in prepaid group health plans, salaried employment, or any other manner of delivering health services whether on a fee-for-service or other basis,
> >
> > (D) a physician's association with, supervision of, delegation of authority to, support for, training of, or participation in a private group practice with, a member or members of a particular class of health care practitioner or professional, or

(E) any other matter that does not relate to the competence or professional conduct of a physician.

For purposes of the protection set forth in subsection 1111(a) of this title, a professional review action must be taken —

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

42 USC § 11112(a).

In any suit brought against a defendant, to the extent that a defendant has met the standards set forth under section 11112(a) of this title and the defendant substantially prevails, the court shall, at the conclusion of the action, award ... [the prevailing defendant] the cost of the suit attributable to such claim, including a reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith.

42 USC § 11113.

At least one court has found that expert witness testimony by a physician is a type of medical service within the meaning of the Act. In *Austin v. Ass'n of Neurological Surgeons*, 253 F.3d 967, 974 (7th Cir. 2001), the court held that

although Dr. Austin did not treat the malpractice plaintiff for whom he testified, his testimony at her trial was a type of medical service and if the quality of his testimony reflected the quality of his medical judgment, he is probably a poor physician. His discipline by the Association therefore served an important public policy exemplified by the federal Health Care Quality Improvement Act, 42 U.S.C. § 11101 et seq., which encourages hospitals to conduct professional review of its staff members and report malpractice to a federal database.

Here, the defendant's ACOG complaint addressed the plaintiff's professional conduct as an expert witness giving medical testimony. The ACOG grievance addressed professional matters, raised questions

14

regarding the College's code of ethics, and could have resulted in the suspension or expulsion of the defendant.  The court finds that the ACOG complaint falls within the scope and purpose of the Heath Care Quality Improvement Act, and that as a result no action for damages may be maintained herein.

At the same time, the court can under no circumstances grant the motion for summary judgment of the plaintiff.  That motion is grounded on a narrative of facts which is wholly free from any specific citations to the evidence, disregarding the requirements of D.Kan.R. 56.1(d).  Further, much of the evidence appended to plaintiff's motion takes the form of various articles and other documentary exhibits which are offered without verification, foundation, or demonstration that the evidence is grounded on personal knowledge rather than hearsay.  Accordingly, there is no factual grounding for plaintiff's motion.

IT IS ACCORDINGLY ORDERED this 29th day of June, 2006, that the plaintiff's Motion for Partial Summary Judgment (Dkt. No. 43) is denied; defendant's Motion for Summary Judgment (Dkt. No. 44) is granted; defendant's Motion to Strike (Dkt. No. 49) is denied as moot.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE